**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Keith Graves,** | : | |
| **Plaintiff,** | : | **Civil Action** |
| | : | |
| **v.** | : | **No. 26-_____** |
| | : | |
| **City of Philadelphia, John Doe as** | : | **Jury Trial Demanded** |
| **Personal Representative of the Estate of** | : | |
| **Officer Cheryl Monzo, Joseph Mooney,** | : | |
| **Thomas McDevitt, Kevin Gage, Daniel** | : | |
| **O'Malley,** | : | |
| **Defendants.** | : | |
| | : | |

**COMPLAINT**

**I.      Preliminary Statement**

1.      This action seeks relief for the unconstitutional actions by the named individual defendants and the City of Philadelphia ("City") which caused the false arrest, malicious prosecution, wrongful conviction, and incarceration of plaintiff Keith Graves for a robbery that he did not commit. The defendants secured Graves's arrest by using highly suggestive and unreliable identification procedures and by submitting an affidavit that omitted information showing the unreliability of those procedures. They recklessly ignored evidence that Graves was innocent and deliberately withheld information identifying the actual perpetrator. As a result of this misconduct, Graves served close to 23 years in prison until the real perpetrator of the crime admitted his guilt and exonerated Graves.

2.      In the early morning hours of July 28, 2001, several persons engaged in a violent robbery at the Ten Spot Bar ("Bar") in South Philadelphia. There were sixteen patrons and workers in the Bar at the time of the robbery, and the perpetrators assaulted many of them. Victims described "mayhem," as patrons and workers were directed to remove their clothing,

and one woman was raped. Others were forced into a caged area in the basement and held there while the perpetrators collected money and jewelry.

3.    At the conclusion of their investigation, the defendant police officers alleged that there were four perpetrators. One of them, Todd White, had entered the Bar earlier in the evening posing as a patron and then closed the door of the Bar after three other men entered. The other men entered the bar and then masked themselves and pulled out firearms as they began to assault and rob the patrons and workers. The defendant officers claimed that these men were Takay Taylor, David Taylor, and plaintiff Keith Graves.

4.    Graves was familiar to many of the people in the Bar at the time of the incident, who knew him by the nickname "Tino." Shortly after the incident, investigating officers interviewed all sixteen victims. All of the victims had been able to see the face of the perpetrator whom police later claimed was Graves. Yet none of them named Graves as one of the perpetrators.

5.    On the night of the robbery, there were only two highly tenuous pieces of evidence linking Graves to the crime.

6.    The first came from a patron, Dana DeLucia, who stated that one of the robbers had a deep and gravelly voice that "sounded like" Graves, and that her certainty on a scale of 1-10 was a 7. In later testimony, she expressed uncertainty about whether the person whose voice she described was Graves or, rather, Takay Taylor.

7.    During the robbery, the perpetrator whom police claimed was Graves held patrons and workers at gunpoint in the caged area of the basement. According to several people interviewed by police, including DeLucia, the masked man who had held people in the caged

area made notable statements. He apologized to the victims and told them he had a wife and four children to support in South Philadelphia. He also stated: "This is what crack does to you."

8.      These statements were inconsistent in every respect with what police knew about Graves. He was not married. He had two children, not four. He did not have a drug habit. And he lived in New Jersey.

9.      The second piece of tenuous evidence was the statement of William Fiorillo, who lived near the Bar and claimed that he looked out of his third-floor apartment window at about 1:00 a.m. and observed a person he thought was Graves. Fiorillo stated that it was too dark to see what that person was wearing. Further, the description he provided—a Black male with hazel eyes, light skin, thick and short caramel hair, a tattoo on the right forearm, and no facial hair— was different from Graves in every relevant respect. Graves had brown eyes and brown hair, had a dark to medium complexion, had a mustache and goatee, and had no tattoos.

10.      In the days after the robbery, investigators developed compelling evidence pointing to Takay Taylor, who later admitted his guilt, and Todd White, the man who posed as a patron and closed the door after the other men entered the Bar. There was also evidence regarding David Taylor, who was convicted at trial, but later exonerated.

11.      In addition, police obtained information that directly pointed to James Lewis as one of the perpetrators. Lewis's background was a match for that of the perpetrator who held Bar patrons and workers in the caged area of the basement. Lewis was married with four children. He lived in South Philadelphia. He struggled with drug abuse. He had multiple tattoos on his right arm, like the man described by Fiorillo.

12.       Lewis was also from the same South Philadelphia neighborhood as Takay Taylor and Todd White. Graves had no connection to any of the other perpetrators.

13. Despite the compelling evidence pointing to Lewis, the defendant officers conducted no investigation into his involvement in the crime. They did not explore Lewis's connection to Takay Taylor and Todd White. Nor did they show Lewis's photo to any of the robbery victims.

14. Instead, in a rush to judgment, and lacking any reliable identifications, or physical, forensic or other evidence that Graves was involved, police sought to link Graves to the robbery. They did so by highly suggestive and unconstitutional identification procedures. Two weeks after the robbery, they secured unreliable and qualified voice identifications from two patrons, Joseph DeJesus and Micheline Medica, who knew Graves, but who had made no previous mention of seeing him or recognizing his voice when questioned by investigators on multiple occasions.

15. Following these unreliable identifications, police secured an arrest warrant for Graves based on an affidavit that omitted any reference to the suggestive identification procedures used to implicate Graves. The affidavit likewise failed to reference the information police had obtained linking James Lewis to the robbery—favorable information that police withheld from the prosecutors until the eve of trial.

16. At trial, there was no physical or forensic evidence linking Graves to the crime. Nor was there evidence that Graves knew or ever associated with the three other accused perpetrators, all of whom had close associations with each other. Further, the perpetrator who police alleged was Graves was described by multiple victims and witnesses with physical characteristics far different from Graves—but which were consistent with Lewis.

17. As a direct and proximate result of the defendants' misconduct, Graves was convicted of several offenses and sentenced to 23½ to 65 years in prison.

18.    After years of appeals, and post-conviction proceedings in state and federal court, in 2023, the Conviction Integrity Unit ("CIU") of the Philadelphia District Attorneys' Office, initiated a review of the case at the urging of Common Pleas Judge M. Teresa Sarmina. Judge Sarmina had denied post-conviction relief for Graves but stated that Graves might well be factually innocent.

19.    In January 2024, CIU lawyers interviewed James Lewis, who was then serving a prison sentence for a murder committed after the Bar robbery. In the interview, Lewis gave a spontaneous and fully voluntary confession, admitting that he was the actual perpetrator. He provided facts which could have been known only to the perpetrators, all of which were fully corroborated by other evidence in the case. Based on that confession and corroborating information, on May 22, 2024, the Court of Common Pleas granted Graves a new trial and approved a motion for dismissal of all charges.

20.    The wrongful conviction and imprisonment were the direct result of the individual defendants' use of highly suggestive and unconstitutional identification procedures, reckless disregard for the falsity of testimony implicating Graves while having information pointing to James Lewis as the actual perpetrator, suppression of favorable information concerning Lewis's involvement, and submission of a misleading affidavit of probable cause.

21.    Graves's wrongful conviction and imprisonment were also the direct result of defendant City of Philadelphia's long-standing practices and customs of unlawful conduct in criminal investigations and of failing to adequately train, supervise, and discipline investigators and other law enforcement officers to comply with constitutional obligations.

22.     Graves brings civil rights claims under 42 U.S.C. § 1983 and supplemental state law claims under Pennsylvania law seeking accountability for the violation of his constitutional rights and substantial harms and losses he suffered

## II.     Jurisdiction and Venue

23.      This Court has jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

24.     Venue is proper in this Court as the incidents at issue occurred within the Eastern District of Pennsylvania.

## III.     Parties

25.     Plaintiff Keith Graves is a resident of West Deptford, New Jersey.

26.     Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and operates, manages, and directs the Philadelphia Police Department, which at all relevant times, employed the individual defendants.

27.     Defendant John Doe is the personal representative of the Estate of Cheryl Monzo. Monzo was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Special Victims Unit. As Monzo is deceased, Doe is sued in his capacity as the personal representative of Monzo's estate. The identity of the personal representative of Monzo's estate is unknown at this time but, after preliminary discovery, plaintiff will amend this pleading to properly identify the appropriate personal representative.[1]

28.     Defendant Joseph Mooney was at all times relevant to this Complaint a Captain in the Philadelphia Police Department's Special Victims Unit. He is sued in his individual capacity.

---

[1] Although Monzo is deceased and the formal defendant is Doe as the representative of Monzo's estate, the defendant is referred to throughout this Complaint as "Monzo."

29.     Defendant Thomas McDevitt was at all times relevant to this Complaint a Lieutenant in the Philadelphia Police Department's Special Victims Unit. He is sued in his individual capacity.

30.     Defendant Kevin Gage was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Special Victims Unit. He is sued in his individual capacity.

31.     Defendant Daniel O'Malley was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Special Victims Unit. He is sued in his individual capacity.

32.     At all times relevant to this Complaint, the defendants acted under the color of state law, in concert and conspiracy, and they are jointly and severally responsible for the harms and losses suffered by Graves.

## IV.     Facts

### A.     The Investigation of the Ten Spot Bar Robbery and the Unconstitutional Identification Process

33.      The robbery of sixteen persons at the Bar occurred in the early morning hours of July 28, 2001.

34.     Because the incident involved a sexual assault, the Philadelphia Police Department ("PPD") assigned investigative responsibility to detectives in the Special Victims Unit ("SVU"). Defendant Monzo was the lead investigator, and she worked with other SVU detectives, including defendants Mooney, McDevitt, Gage, and O'Malley.

35.     On the night of the robbery, a patron, Dana DeLucia, asserted that one of the robbers "sounded like" a person known to her as Tino—the nickname for plaintiff Keith Graves. DeLucia had only a 7 out of 10 level of confidence and she did not make a facial identification of this assailant, even though she knew Graves from prior contacts at the Bar. DeLucia later stated

at trial that she could not specify whether the person whose voice she described was that of Takay Taylor or Graves.

36. On the night of robbery, William Fiorillo, who lived near the Bar, claimed that he looked out of his third-floor apartment window at about 1:00 a.m. and observed a person he thought was Tino. Fiorillo stated that it was too dark to see what that person was wearing. Further, the description he provided—a Black male with hazel eyes, light skin, thick short caramel hair, a tattoo on his right forearm, and no facial hair—was different from Graves in every relevant respect. Graves had brown eyes and brown hair, had a dark to medium complexion, had a mustache and goatee, and had no tattoos.

37. The two witnesses who became the centerpiece of the case against Graves at trial were Joseph DeJesus and Micheline Medica.

38. DeJesus, who had known Graves for 15 years and was familiar with his nickname, Tino, was seated facing the front door of the bar so that he could observe patrons as they entered. He had consumed three and a half beers, and during the attack he was struck four times in the head with a firearm, causing bleeding and a concussion. The statement he gave to investigators on the same day of the incident did not mention Graves as one the perpetrators.

39. Three days later, at a follow-up interview with defendant Monzo, DeJesus identified Takay Taylor and Todd White as perpetrators but again made no mention of Graves. Defendant Monzo, who had heard the name Tino from DeLucia, showed DeJesus a photo of a man named Anthony Davis and asked DeJesus whether he could identify Davis as Tino. Yet, even with the clear suggestion that Tino was involved in the robbery, and despite his knowledge that the name Tino referred to Graves, DeJesus made no assertion that Graves was involved.

40. Medica, who worked as a bartender but was present as a patron the night of the robbery, also knew Graves as Tino. She was seated near the entrance to the bar and later identified two of the robbers, Takay Taylor and Todd White. In the statement she gave to investigators on the same day of the incident, she did not state that Graves entered the Bar, and she described the perpetrator who police claimed was Graves as a person who weighed seventy pounds less than Graves.

41. At a follow-up interview three days later, Medica was asked by defendant Monzo to give a description of Tino. She did so but again did not state that Graves was the perpetrator.

42. At a lineup, both DeJesus and Medica identified an innocent filler as one of the perpetrators.

43. On August 10, 2001, two weeks after the robbery, and still without an arrest of the person police believed to be the final perpetrator, defendant Monzo conducted highly suggestive identification procedures to have Medica and DeJesus identify Graves.

44. Neither Medica nor DeJesus had previously indicated that Graves was involved, notwithstanding defendant Monzo's suggestions that Tino was one of the perpetrators. Yet, in her August 10 interviews with both witnesses, defendant Monzo displayed a photospread that included Graves and she asked them which of the photographs was Tino.

45. Medica and DeJesus identified Graves as Tino. Defendant Monzo then took the highly suggestive and constitutionally impermissible step of asking them whether they could identify any of the persons in the *same* photospread as one of the perpetrators.

46. Medica made no facial identification from the photospread. However, as a direct result of Monzo's suggestive and inherently unreliable procedure, Medica made a qualified and tentative voice identification of Graves, stating that she had a seven out ten certainty that she had

9

heard Graves's voice the night of the robbery. She did so despite never previously mentioning Graves as a perpetrator.

47.    DeJesus made no facial identification and stated only that one of the assailants sounded like Graves, with a certainty he rated as eight or nine out of ten. DeJesus, like Medica, had not previously identified Graves as one of the perpetrators. Further, DeJesus had previously informed the defendants that he did not see Graves at the Bar at the time of the robbery.

48.    Voice identifications are far less reliable than eyewitness identifications and both are leading causes of wrongful convictions, a fact the defendants were aware of at the time of their investigation.

**B.    The Failure to Investigate the Actual Perpetrator and the Failure to Disclose Highly Material Favorable Evidence Concerning that Perpetrator**

49.    Early in the investigation, defendant Captain Mooney received a tip from an unnamed police source about the identity of the unknown perpetrator. Mooney, who believed the tip to be reliable, memorialized the tip in a memorandum, referencing "Jay," who lived at 3109 Tasker Street, and "Teke" as two of the perpetrators.

50.    Mooney passed the information about "Jay" and "Teke" on to defendant Lieutenant McDevitt, who, in turn, assigned defendant Detectives Gage and O'Malley to conduct a follow up investigation.

51.    Gage and O'Malley quickly determined that "Jay" was James Lewis, who lived at the 3109 Tasker Street location with his wife and four children, and that "Teke" was Takay Taylor.

52.    This evidence was highly favorable to Graves, and its exculpatory value was clear to defendants Monzo, Mooney, McDevitt, Gage, and O'Malley. Multiple victims of the robbery had described one of the perpetrators as stating that he had a wife and four children in South

10

Philadelphia and mentioning his crack addiction. Lewis had tattoos on his right arm like the person described by Fiorillo, and he also had a deep, gravelly voice like that described by several witnesses.

53.   These facts did not match Graves, who was not married, had only two children, was not a drug user, and was a resident of New Jersey. Further, the physical descriptions provided by victims were significantly different from Graves.

54.   Knowing that the tip referencing Lewis was significant, on August 8, 2001, defendants Gage and O'Malley submitted a PPD "Request for Extract of Criminal Record," seeking records and/or fingerprint comparisons for Todd White, Keith Graves, David Taylor, Takay Taylor, and James Lewis.

55.   Gage and O'Malley noted on the Request that the lead investigator in the case was Detective Monzo.

56.   The information concerning Lewis—the initial memorandum prepared by Captain Mooney and the request for criminal extracts and fingerprint comparisons referencing Lewis by name—was placed in the investigation file maintained by Monzo.

57.   As a result, all defendants were aware of the critical information pointing to Lewis as the perpetrator.

58.   The tip initially reported to Captain Mooney was also proven reliable, as there was significant information, including DNA evidence, that corroborated Takay Taylor's involvement in the crime. Taylor entered a guilty plea on the eve of trial.

59.   There was also objective information connecting Taylor to Lewis. Taylor had "31st and Tasker" tattooed on his right forearm, a reference to the intersection where Lewis lived.

11

60.    Despite the clear and reliable information pointing to James Lewis as the actual perpetrator whom police claimed was Graves, defendants failed to conduct additional investigation into Lewis and, instead, proceeded with a prosecution against Graves.

### C.    Defendants Secure Graves's Arrest by Suppressing Favorable Information from the Affidavit of Probable Cause

61.    On August 10, 2001, defendant Monzo prepared an affidavit of probable cause in support of a request to arrest Graves. In accord with PPD practice and custom, Monzo omitted from the affidavit facts regarding both the highly suggestive identification procedures and the exculpatory information that pointed to James Lewis as the perpetrator and undermined claims of Graves's involvement.

62.    At that point in the investigation, the individual defendants had compelling evidence that James Lewis was one of the perpetrators, including: (a) a highly reliable tip, with internal corroboration, that Lewis and Takay Tayor were involved, (b) that Lewis lived at 31st and Tasker Streets, a short walk from where Takay Taylor and Todd White lived, while Graves lived in New Jersey and there was no evidence that Graves ever associated with the known perpetrators; (c) Lewis had a wife and four children and a drug habit, all facts which the perpetrator had mentioned to victims; (d) the person police claimed was Graves entered the bar without a mask, yet was not facially identified by any patron or worker, many of whom knew him from previous visits to the Bar; and (e) the victims provided physical descriptions of a person with far different characteristics.

63.    As a result of Monzo's suppression of this critical information that undermined any finding of probable cause for the arrest of Graves, a warrant was issued. Graves was taken into custody on or about August 11, 2001.

12

D.    **The Trial and Post-Trial Proceedings**

64.    Graves was tried, along with co-defendants David Taylor and Todd White before Judge Sarmina and a jury in September 2002.

65.    At the time of trial, as a result of the defendants' failure to disclose the information concerning James Lewis before trial, defense counsel did not have relevant evidence that could show that Lewis was the perpetrator, and the jury was not informed of this evidence. The jury returned guilty verdicts on charges of robbery, rape, and related offenses. On November 13, 2002, Judge Sarmina sentenced Graves to 41 to 105 years of imprisonment.

66.    On direct appeal, Graves's sentence was vacated on the ground that there was insufficient evidence to support his conviction for rape and related sexual assault charges. He was then resentenced to 23 ½ years to 65 years' imprisonment.

67.    Between 2007 and 2014, Graves filed post-conviction petitions in state and federal court and, at each stage, he was denied relief.

68.    In 2015, Graves encountered a man named John White, who had recently been transferred to SCI Frackville, the prison where Graves was then incarcerated. In this encounter, White spontaneously told Graves that he knew he was innocent. White had been living with James Lewis in the summer of 2001 and explained that he had planned the robbery, along with James Lewis, Takay Taylor, and Todd White. White further stated that on the night of the robbery he had not gone to the bar because he had gotten high on Xanax and fallen asleep. After the robbery, Lewis had shown him a bag of money and jewelry taken during the robbery, some of which Lewis gave to White.

69.    Following this encounter, Graves's post-conviction counsel met with White, who gave counsel specific and detailed inside information about the Ten Spot Bar robbery that made

13

clear White had been part of the group that planned the robbery. The information provided by White also showed that Graves, whom White did not know at the time, had nothing to do with this crime, and that James Lewis, with whom White was living, was the perpetrator who engaged in the acts that police claimed had been committed by Graves.

70.    Graves sought post-conviction relief based on White's statements, but shortly before the court hearing, White was paroled to a halfway house in Philadelphia and expressed concerns about his possible exposure to criminal charges and to possible retaliation by associates of James Lewis if he testified in court. At an evidentiary hearing, White confirmed that at the time of the Bar robbery he was living in South Philadelphia, that James Lewis (then separated from his wife and family) was living with him at that location, that he had grown up with Lewis in South Philadelphia, and that he knew Takay Taylor from that same neighborhood. However, fearful of prosecution or retaliation, White falsely denied any knowledge of the planning or commission of the robbery.

71.    Judge Sarmina denied relief on technical jurisdictional grounds. However, she recognized the distinct possibility that Lewis was the co-conspirator and that Graves was innocent. Accordingly, she contacted the CIU to urge CIU lawyers to investigate the case, making clear that her ruling did not "mean that perhaps [Graves] is not guilty."

72.    The CIU conducted a full investigation that focused on James Lewis, who was then serving a sentence for a murder he committed after the Bar robbery.

73.    In January 2024, CIU attorneys met with Lewis. Having fully informed Lewis of his *Miranda* rights and that they were investigating Graves's conviction, the CIU lawyers questioned Lewis about role in the robbery. In direct response, and notwithstanding that an admission could seriously jeopardize parole on his sentence, Lewis admitted his involvement,

stated that Graves had been wrongfully convicted, and disclosed inside information regarding the planning and execution of the robbery, including his association and planning with John White.

74. Based on this information, Graves filed a new post-conviction petition. The prosecution agreed he was entitled to relief, and, on May 22, 2024, the Court of Common Pleas vacated his conviction and granted a request to dismiss the charges.

75. Graves was then released from prison, having served nearly 23 years for a crime he did not commit.

**E.    Policies, Practices, and Customs of the Philadelphia Police Department Caused the Violation of Graves's Constitutional Rights**

76. Defendants' misconduct in the investigation of the Ten Spot robbery was the direct result of systemic failures in the training and supervision of police investigators and of longstanding deficiencies in the PPD's procedures for the discipline of officers engaged in misconduct, all of which were known to, and deliberately ignored by the City of Philadelphia's policymakers.

77. These failures and deficiencies allowed officers, including the individual defendants, to engage in investigative misconduct without fear of detection or accountability.

78. For many years dating back to the early 1990s and continuing beyond the time of the investigation of the Ten Spot robbery, the City of Philadelphia had in force and effect a policy, practice, or custom of unconstitutional misconduct in felony investigations, including fabricating inculpatory evidence and suppressing material favorable evidence.

79. During the 1980s and 1990s, concurrent with the time of the investigation of this case, the PPD engaged in a pattern, practice, and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments. On three separate occasions in the 1980s, courts in the Eastern District of

Pennsylvania issued orders enjoining PPD from engaging in these practices. *See Cliett v. City of Philadelphia*, C.A. No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and detention of 1,500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F. Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring Garden area in an investigation); *Arrington v. City of Philadelphia*, C.A. No. 88-2264 (E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

80.     Thereafter, in the late 1980s and early 1990s, a narcotics squad operating out of the 39th Police District in Philadelphia engaged in widespread unconstitutional practices, including fabrication of search and arrest warrants and other false allegations of criminal conduct, planting of evidence on suspects, coercive and physically abusive interrogations, and theft of money and drugs. This squad, led by Officer John Baird, engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the PPD, including the disregard of credible complaints to IAD and the District Attorney's Office, deliberately biased internal investigations, and a practice and custom of exonerating police officers regardless of the evidence of misconduct. This systemic and unconstitutional practice and custom was not addressed in any fashion by the PPD, thus requiring the intervention of the FBI, who commenced an investigation into the officers' conduct, resulting in multiple federal prosecutions.

81.     As a result of this pattern of police misconduct, a Court in the Eastern District entered a Consent Decree in a class action injunctive suit requiring wide ranging reforms in the PPD, and providing for specific limitations on the investigative practices and policies of the PPD. *See NAACP v. City of Philadelphia*, No. 96-cv-6045. The Consent Decree directed

attorneys for the plaintiff class to monitor the City's implementation of reforms to PPD practices. In a series of monitoring reports issued in the late 1990s, class counsel identified multiple areas of unlawful investigative practices present throughout the PPD. The provision of those reports to the Court and the PPD informed PPD's leadership that the unconstitutional conduct at issue in the 39th District was present throughout the PPD.

82.     The reports identified patterns of activity and practices that placed the City of Philadelphia on notice as to the risk of systemic misconduct like that present in the Ten Spot robbery investigation, focusing in particular on the presence of a Code of Silence within the PPD—that is, the refusal of officers to report the misconduct of their fellow officers. The conclusions regarding the Code of Silence included:

a.  A September 1997 report reviewing the practices of PPD's Internal Affairs Division and finding evidence of a widespread Code of Silence, and, further, that officers subject to disciplinary investigations habitually lied to cover up their own misconduct;

b.  A July 1998 report finding that, despite the warnings provided in the September 1997 report, the Code of Silence persisted throughout PPD, and specifically noting that the continuous failure to prevent the coverup of officer wrongdoing communicated the message to rank-and-file officers that their misconduct would be tolerated; and

c.  A September 1999 report noting continued concern about the Code of Silence observed in a review of PPD internal investigations of misconduct allegations and emphasizing that the refusal to report instances of misconduct extended beyond line officers and into the supervisory ranks.

83.    In this same time period, there was significant public attention directed at the related failures of the PPD's Internal Affairs process. In July 1999, the *Philadelphia City Paper* published a comprehensive account of the failure of the Internal Affairs Division to investigate allegations of misconduct made by a high-ranking Philadelphia union official regarding a groundless traffic stop. As the account reported, the Deputy Commissioner charged with commanding the Internal Affairs Division inexplicably refused to initiate the investigation and then, even after he had been accused of wrongdoing in connection with that refusal, signed off on a report finding no misconduct. When questioned about the Deputy Commissioner's actions, the head of the PPD officers' union noted that this conduct was "where the seeds of corruption are planted," as officers "begin to figure that [the top brass doesn't] follow the rules, so why should I?"

84.    Despite repeated notice to the City of Philadelphia's policymakers regarding systemic deficiencies in the PPD's disciplinary system, the issues identified above continued unabated through the time of Graves's wrongful arrest.

85.    Based on a series of reports issued throughout the early 2000s by the PPD Integrity and Accountability Office (IAO)—a unit created as a result of the *NAACP v. City of Philadelphia* Consent Decree for the purpose of identifying and remedying systemic corruption and misconduct within the PPD—the City of Philadelphia's policymakers were fully aware of the substantial risk of wrongdoing like that which led to Graves's arrest. Despite that knowledge, they failed, with deliberate indifference, to act to mitigate that risk.

86.    In March 2001, just five months before Graves's wrongful arrest, the IAO released a report addressing deficiencies in the disciplinary system and finding that these deficiencies "contribute to a system that is somewhat inscrutable, inconsistent, lacking in focus,

18

and validate and perpetuate the widespread organizational perception that discipline is meted out selectively and capriciously."

87.     Pursuant to these findings, Philadelphia Mayor John F. Street established a Task Force on Police Discipline, which issued recommendations in November 2001, three months after Graves's arrest. This report described the Disciplinary Code as "outdated [and] imprecise," "seriously deficient," and "overly vague," all of which resulted in "seemingly arbitrary charges" for police misconduct. The Task Force "strongly urged" that a revised Code be "adopted and implemented as soon as possible."

88.     Two years later, in December 2003, the IAO released a follow-up study to its 2001 report and the Task Force's 2001 report. This IAO report, which provided a view on disciplinary practices that prevailed in and around the time Graves's unlawful arrest, criticized the PPD for making "no meaningful attempt . . . to eliminate the possibility for manipulating the outdated and ineffective Disciplinary Code" since the publication of the 2001 reports.

89.     "Since 2000," the 2003 IAO report documented, "close to one-half of the officers, supervisors, and commanders who were found by the Internal Affairs Bureau to have violated Departmental policies, or engaged in serious misconduct, were never formally disciplined." The report criticized "the inherent fraternity" and "the incestuous nature" of the relationships that exist among "those enforcing discipline[] and those for whom discipline is warranted[.]" The dismissive reaction of PPD officials to the report's findings "clearly indicated that key Departmental personnel have limited ability to understand the broader ramifications of officer misconduct and violations of Departmental Directives." The 2003 report thus made clear that the City of Philadelphia had ratified and endorsed the woefully deficient practices that led directly to Graves's wrongful arrest.

90.    PPD leadership was aware of all these systematic deficiencies in PPD discipline of serious corruption by the time of the Ten Spot robbery in 2001 and took no action to remedy the situation and ensure PPD officers were adequately supervised and disciplined.

91.    The acts, omissions, systemic flaws, policies, and customs of defendant City of Philadelphia caused defendants to believe that their unlawful misconduct would not be detected through proper supervision nor properly investigated if detected, with the foreseeable result that the unlawful acts of the defendants and others would result in the wrongful conviction and imprisonment of innocent individuals, like Graves.

92.    These systemic deficiencies resulted in a jury verdict in August 2025 in the matter of *Termaine Hicks v. City of Philadelphia*, No. 22-cv-0977, which held the City liable for causing Hicks's wrongful conviction. Hicks had been convicted for a November 2001 rape based on the testimony of multiple officers that they observed him commit the sexual assault and that they shot him when he pointed a firearm at them. The jury, in response to an interrogatory, expressly found that Hicks did not commit the rape and did not pull a firearm. The jury found that the defendants, including detectives in the SVU (the same unit where the defendants in this case were assigned in the same time period of the Ten Spot robbery investigation), fabricated the allegations to justify their actions in wrongfully shooting and prosecuting Hicks. The jury also found that the City's custom and practices and its deliberate indifference to the need for supervision and discipline caused the officers' misconduct.

**G.    The Violations of Mr. Graves's Constitutional Rights and the Resultant Harms**

93.    Graves's unlawful arrest, prosecution, conviction, and incarceration were caused by the conduct of the individual defendants and defendant City of Philadelphia. The individual defendants knowingly, intentionally, and recklessly ignored, concealed and suppressed favorable

information, employed suggestive and unconstitutional identification procedures, and maliciously prosecuted Graves pursuant to policies, practices, and customs of defendant City of Philadelphia, and the failure to properly train, supervise, and discipline officers and detectives who engaged in unconstitutional conduct.

94.     As a direct and proximate result of defendants' actions and omissions, Graves sustained loss of his freedom, loss of productive years of his adult life, pain and suffering, mental anguish, emotional distress, indignities, loss of natural psychological development, and restrictions on personal freedoms and autonomy, including educational, vocational, and athletic opportunities, sexual relationships, family relations, travel, and freedom of speech and expression.

95.     As a direct and proximate result of the defendants' actions and omissions, Graves sustained economic injuries and damages, including loss of income and loss of career opportunities.

96.     As a direct and proximate result of the defendants' actions and omissions, Graves sustained physical pain and suffering.

97.     As a direct and proximate result of defendants' actions and omissions, Graves sustained mental anguish and emotional distress, which he continues to experience, and which will continue in the future.

## V.     Causes of Action

98.     Plaintiff Keith Graves brings claims against the City of Philadelphia and the individual defendants Captain Joseph Mooney, Lieutenant Thomas McDevitt, John Doe as personal representative of the estate of Cheryl Monzo, Detective Kevin Gage, and Detective Daniel O'Malley.

## Count 1
### Plaintiff v. Individual Defendants
### Fabrication of Evidence

99.     The individual defendants fabricated evidence in support of a prosecution against

Graves and/or aided and abetted the introduction of fabricated evidence. The fabrication of this

evidence caused Graves's wrongful conviction and, therefore, violated his right to a fair trial and

due process of law under the Fourteenth Amendment to the U.S. Constitution.

## Count 2
### Plaintiff v. Individual Defendants
### Suggestive Identification Procedures

100.     The individual defendants caused Graves's unlawful arrest, prosecution,

conviction, and imprisonment by the use of suggestive and unreliable identification procedures,

and, therefore, violated his right to due process of law under the Fourteenth Amendment to the

U.S. Constitution.

## Count 3
### Plaintiff v. Individual Defendants
### Malicious Prosecution

101.     The individual defendants caused the initiation of a prosecution against Graves

without probable cause and with malice. The criminal charges they caused to issue against

Graves were terminated favorably to Graves. These defendants, therefore, subjected Graves to a

malicious prosecution in violation of the Fourth and/or Fourteenth Amendments to the U.S.

Constitution.

## Count 4
### Plaintiff v. Individual Defendants
### Deliberate Suppression of Favorable Evidence and Violation of *Brady v. Maryland*

102.     By intentionally concealing and deliberately suppressing favorable evidence, the

individual defendants violated Graves's right to due process of law under the Fourteenth

22

Amendment to the U.S. Constitution, and, additionally, the suppression of this evidence violated Graves's rights under *Brady v. Maryland*.

## Count 5
### Plaintiff v. Defendant City of Philadelphia
### Municipal Liability

103.    Defendant City of Philadelphia, with deliberate indifference, adopted and/or acquiesced in policies, practices, and customs which were a moving force in the violation of Graves's constitutional rights, and, further, defendant City of Philadelphia, with deliberate indifference, failed to properly train, supervise, and/or discipline officers and, as such, was a moving force in the violations of Graves's constitutional rights.

## Count 6
### Plaintiff v. Individual Defendants
### Supplemental Claim – Malicious Prosecution

104.    The individual defendants caused the malicious prosecution of Graves, and, as such, committed the tort of malicious prosecution under the laws of the Commonwealth of Pennsylvania.

**WHEREFORE**, plaintiff Keith Graves respectfully requests:

A.     Compensatory damages as to all defendants;

B.     Punitive damages as to the individual defendants;

C.     Reasonable attorneys' fees and costs;

D.     Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

/s/ David Rudovsky
David Rudovsky
ID No. 15168

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
ID No. 88227

/s/ Eleanor Carpenter
Eleanor Carpenter
ID No. 336200

KAIRYS, RUDOVSKY, MESSING,
 FEINBERG & LIN LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Plaintiff*